UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

 Plaintiff,

v.                      No. 1:19-cr-01832-JCH

STEVEN O'NEIL,

 Defendant.

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTIONS TO SUPPRESS EVIDENCE**

This matter is before the Court on Defendant Steven O'Neil's Motion to Suppress Evidence Seized through Illegal Search (ECF No. 19) and Motion to Suppress Out-of-Court and In-Court Identifications (ECF No. 20). The Government responded in opposition to both motions (ECF No. 21), to which Defendant filed a reply (ECF No. 22). The Court held an evidentiary hearing on January 19, 2021. The Court, having considered the motions, briefs, evidence, arguments, and being otherwise fully advised, concludes that the motions will be **denied**.

**I. Factual Findings**

On the evening of December 1, 2018, Matthew Salmon and his then-girlfriend Cagsu Caglar parked Salmon's car at a University of New Mexico parking lot. January 19, 2021 Motion Hearing Transcript 10:5-19; 13:7-10 (2021 Tr.). While Salmon went to a pay for parking, Caglar remained seated in the car's passenger seat. *Id*. 96:24-25. She observed a man, whom she later identified as Defendant, four or five parking spaces away, peering into vehicles. May 6, 2019

Motion Hearing Transcript 17:8-10 (2019 Tr.). He wore a hoodie, loose jeans, and had a backpack. 2021 Tr. 98:12-17.

Although the hood covered Defendant's head, Caglar saw that he had ginger-brown colored hair and a beard. *Id*. 98:18-21. It was nighttime, but lights illuminated the lot. *Id*. 99:13. Defendant made his way closer to Salmon's car and Caglar saw that he held a black handgun. *Id*. 97:8-10. He eventually came to the passenger side where Caglar sat and was about two inches from the window, looking at Caglar. *Id*. 99:3; 2019 Tr. 20:2-4. Caglar looked at his face for ten to fifteen seconds. 2021 Tr. 110:11-15.

When Salmon returned to his car, he saw Defendant standing at the passenger door. 2019 Tr. 13:18-20. Defendant and Salmon silently stared at each other over the roof of the car and the two men "locked eye[s]." 2021 Tr. 13:21-23; 2019 Tr. 43:14. Salmon observed Defendant "very clearly" and "had a perfect visual" of him. *Id*. 43:13-15. Defendant then pointed the gun at Salmon and emptied the gun's magazine to indicate that the clip was loaded. 2021 Tr. 13:24-25, 15:4-6. Salmon was familiar with guns and believed the weapon to be a nine-millimeter. *Id*. 15:2. This encounter of "hard eye contact" and "staring into each other's faces" lasted about thirty seconds to one minute. *Id*. 24:23-24. Salmon then got into the car and the couple exited the lot without incident. 2019 Tr. 44:18-45:1.

Around 9:23 p.m., Caglar called 911. *Id*. 17:20; 2021 Tr. 74:21-25-75:1. The operator dispatched them to UNM police. *Id*. 18:4-8. They eventually drove to the university police station, where police came outside to talk to them. *Id*. 18:10-22; 19:5-8. Former UNM Officer Nathan Lerner testified that the university parking lot where the incident occurred was a "high[ly] trafficked area" and that passerby were in the vicinity on the night of the incident. *Id*. 41:11, 40:3-15. Lerner was given a description of Salmon and Caglar's claims and told that the

assailant was a male who wore black a hooded sweatshirt, had facial hair, was slimly built and that he was armed and in the area. *Id*. 44:19-23. According to the Computer Aided Dispatch (CAD) report, the description of Defendant was reported at 9:23 pm. CAD Report 2, Govt.'s Ex 1. After the 911 call, Officer Lerner and other officers went to the scene of the incident. 2021 Tr. 44:7-25-45:1-5.

Out of the corner of his eye Officer Lerner saw a man at a bench, wearing a hoodie and holding something black, which Lerner believed was a gun. *Id*. 45:6-10, 46:10-15. There was a backpack on the bench. 2019 Tr. 9-10. As Lerner approached Defendant, the officer believed he "matched the description" of the assailant. 2021 Tr. 45:21. Lerner gave two commands for Defendant to put his hands up, which Defendant ignored. *Id*. 45:23-25-46:1-4. He instead left the bench and walked towards Lerner with his hands in his pockets. *Id*. 46:2-4. Defendant eventually complied with Lerner's third command to put his hands up, got on the ground, and was placed in handcuffs with the assistance of Officer Tim Delgado. *Id*. 46:19-25, 53:16. This occurred at 9:29 p.m. CAD Report at 2; 2021 Tr. 48:1-6.

At 9:34 p.m., Officer Camacho went to pick up Salmon and Caglar, *id*. 48:7-13, and officers "sat [Defendant] up and had the witnesses do a … field identification." 2019 Tr. 64:8-9. Caglar and Salmon were driven together to the parking lot in a single squad car. 2021 Tr. 101:5-8. There were "a lot of cops … detaining" Defendant, who was handcuffed. 2019 Tr. 47:10-11. Viewing Defendant from the inside the squad car as Defendant stood fifteen to twenty feet away and exposed in the car's headlights, Camacho stated, "we need you to ID him … is that the man?" *Id*. 47:12-13; 2021 Tr. 104:15-20.

Around 9:37 p.m., Caglar and Salmon positively identified Defendant as the man in the parking lot. *Id*. 20:25-21:1, 49:7-9. According to Salmon, Defendant "had the same attire on, his

hoodie was on and the same facial hair," 2019 Tr. 47:22-23, and there was "no doubt in [Salmon's] mind that [Defendant] was the same man" from the parking lot. 2021 Tr. 21:5-6. When asked if it was "absolutely clear" to her that Defendant was the assailant, Caglar answered "yes." *Id*. 102:21-23. Salmon testified that identification occurred fifteen to twenty minutes after the parking lot incident. *Id*. 20:4-6.

A couple of minutes after Caglar and Salmon identified Defendant, police ran a National Crime Information Center (NCIC) database search. *Id*. 84:18-25-85:1-5. At 9:39 p.m., dispatch reported that Defendant had a "29," meaning a possible warrant for his arrest. *Id*. 76:1-8. Officer Delgado, who was attempting to locate the unaccounted-for handgun, heard over his police radio that the witnesses had positively identified Defendant. *Id*. 75:2-8, 85:22-25-86:1-4. Three to four minutes after the NCIC search and the witness' identifications, Delgado located and searched the backpack and found a black firearm within. *Id*. 85:15-21, 79:17-18.[1]

When the backpack was searched, it was about twenty to twenty-five feet from where Defendant was standing, *id.* 82:11, and the backpack "was outside of [Defendant's] reach." 2019 Tr. 74:18. When asked if Defendant could have grabbed the gun or other evidence at the time the backpack was searched, Officer Lerner responded "no." *Id*. 75:6-11. The black object that Lerner initially thought was a gun was in fact a shoe. 2021 Tr. 67:15-20. Officer Lerner later booked Defendant while Officer Delgado tagged the gun into the evidence locker. *Id*. 52:5-6, 80:2-4.

---

[1] Although Officer Lerner testified in the federal hearing that the backpack search was done after the in-field identification, he testified to the opposite chronology of events in the state court hearing. *Compare* 2021 Tr. 58:22-25-59:1-3, *with* 2019 Tr. 76:7-8. These differing accounts do not render Lerner's testimony unreliable, but instead highlight gaps in Lerner's recollection of events. Those gaps were filled by Officer Delgado, however, who testified that he personally searched the backpack and consistently maintained that he did so after the witnesses identified Defendant and the NCIC search. The Court credits Officer Delgado's rendition of events and thus finds that the backpack search was done after the witness identifications and NCIC search.

Officer Delgado also generated a property receipt that the Government produced at the suppression hearing. Govt.'s Ex. 2.

At a state court hearing, Caglar and Salmon were cross-examined about their observations. Caglar testified that the encounter in the parking lot lasted about a minute-and-a-half and that she "got a good look," at Defendant during that time. 2019 Tr. 18:8-11, 30:16. On cross-examination, however, she acknowledged that in an earlier pre-trial interview she said she "just got a flash" of Defendant's face because of the stress of the moment and therefore was not able to describe Defendant's appearance in detail. *Id*. 30:14-16, 31:14-19. Salmon apparently described Defendant as slender to police, although he weighed 237 pounds. Defendant's hair color is brown, not ginger as Caglar believed. Moreover, Defendant claims that he had his pet chihuahua with him, which the witnesses did not report seeing.

## II.     Procedural Background

On June 27, 2019, a federal grand jury charged Defendant in a one-count indictment for being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). On April 17, 2020, Defendant filed the two motions to suppress – one to suppress the witnesses' identifications under the Due Process Clause and the other to suppress the gun evidence under the Fourth Amendment. Defendant contends that the witnesses' in-field and potential in-court identifications are unreliable and must be excluded because officers used identification procedures that were highly suggestive. Regarding his Fourth Amendment arguments, Defendant contends that the backpack was searched without a warrant, and the search was not otherwise reasonable under any recognized exception to the Fourth Amendment's warrant requirement.

## III.    Discussion

### A. Due Process Analysis

"The Constitution … protects a defendant against a conviction based on evidence of questionable reliability." *Perry v. New Hampshire*, 565 U.S. 228, 237, 132 (2012). A witness's identification violates a defendant's right to due process when the identification procedure is so suggestive that it creates a substantial likelihood of irreparable misidentification. *United States v. Bredy*, 209 F.3d 1193, 1195 (10th Cir. 2000) (citation and quotation marks omitted). "Yet the admission of evidence rarely implicates due process, as courts typically rely on other means—such as the Sixth Amendment rights to counsel and confrontation—to safeguard the reliability of evidence." *Lee v. Foster*, 750 F.3d 687, 691 (7th Cir. 2014) (citation and quotation marks omitted). However, if those protections "have proven insufficient … courts must step in to prevent injustice." *United States v. Sanders*, 708 F.3d 976, 983 (7th Cir. 2013). "Courts have articulated a two-pronged test for analyzing the admissibility of a pre-trial identification under the Due Process Clause." *United States v. Robertson*, No. 17-CR-02949-MV, 2020 WL 85134, at *6 (D.N.M. Jan. 7, 2020). First, the court determines whether the procedure was "both suggestive and unnecessary." *Perry,* 565 U.S. at 239; *Bredy*, 209 F.3d at 1195. Second, the court asks if under the totality of the circumstances whether the procedure was nevertheless reliable. *Id.* "An identification must fail at both stages to be excludable on Due Process grounds." *Robertson*, 2020 WL 85134, at *6. In *Perry,* the Supreme Court directed courts not to reach the reliability inquiry – prong two – unless the identification resulted from a situation created by improper police conduct. 565 U.S. at 248. The defendant bears the burden of proving undue suggestion. *Rodriguez v. Young*, 906 F.2d 1153, 1162 (7th Cir. 1990).

    **1. Out-of-Court Identifications**

        **a. Prong One: The show-up was both "suggestive and unnecessary"**

            **i. "Suggestive"**

A "show-up," by definition occurs when "the police present only one suspect to the identifying witness[,]" making show-ups "inherently suggestive." *Sanders*, 708 F.3d at 984 (citation and quotation marks omitted). Show-up procedures are problematic because "they imply 'that the police have their man.'" *Robertson*, No. 17-CR-02949-MV, 2020 WL 85134, at *6 (quoting *United States v. Silva*, Case No. 14-CR-4067 JAP, 2016 WL 10587962, at *6 (D.N.M. Mar. 4, 2016)). Therefore, showing suspects "singly to persons for the purpose of identification ... has been widely condemned," even when done in person. *Stovall v. Denno,* 388 U.S. 293, 302 (1967), *overruled on other grounds by Griffith v. Kentucky,* 479 U.S. 314 (1987)). The show-up was suggestive given that Defendant was singly presented.

### ii. "Unnecessary"

"[A] procedure that is suggestive—even when inherently so—may still be necessary." *Sanders*, 708 F.3d at 986. "[C]ontext matters," and thus "the circumstances surrounding an investigation can justify even a show up." *Id*. One such context where "show-up identifications may be necessary [is] when there is an 'imperative' need for an immediate identification." *United States v. Shavers*, 693 F.3d 363, 382 (3d Cir. 2012), *judgment vacated on other grounds*, 570 U.S. 913 (2013) (quoting *Stovall,* 388 U.S. at 302). For example, federal and state courts have upheld show-ups conducted promptly after the alleged crime on the justifications that a witness's memory will be "fresh," and officers can quickly release innocent persons and apprehend the true perpetrator. *See e.g. Shavers*, 693 F.3d 363 at 383 (collecting cases and acknowledging that a show-up may be necessary when there are reports that the suspect uses a gun and it is "vital to know immediately whether the correct people had been apprehended" or "to conduct the identifications while the witnesses' memories were still fresh.") (citations and quotation marks omitted); *Com. v. Figueroa*, 468 Mass. 204, 217, 9 N.E.3d 812, 823–24 (2014)

("We regularly conclude that there is good reason for a showup identification where an eyewitness is shown a suspect promptly after the commission of the crime …. Not only is a prompt identification procedure more likely to be accurate, because the eyewitness's memory is fresh, but also, more importantly, it allows the police to learn quickly whether the suspect is the perpetrator of the crime so that, if he is not, the police can continue the investigation to find the actual perpetrator.") (citations omitted).

Here, the show-up identifications were unnecessarily suggestive. Defendant – the only suspect shown – was handcuffed, surrounded by police officers, and at the scene of the crime. This gave the impression that "the police ha[d] their man," and both witnesses in fact testified that they knew Defendant was in custody at the time they observed him. *Robertson*, 2020 WL 85134, at *6. The witnesses made their identifications in each other's presence while sitting in the police cruiser and after the officer asked, "We need you to ID him … is that the man?", although courts have endorsed less-suggestive procedures, such as separating witnesses during the in-field identification. *See Shavers*, 693 F.3d at 383 (noting that "despite the urgency at hand … the suggestiveness of the identification procedure could have been easily minimized if the officers had parked down the street and brought each eyewitness separately to make an identification."); *Kaliku v. United States*, 994 A.2d 765 (D.C. 2010) (upholding an in-field show-up where two victims were taken to scene of arrest in separate cruisers and identified the handcuffed defendants). Defendant has carried his burden of proof to show that the procedures used were unnecessarily suggestive, despite the alleged urgency.

### b. Prong Two: Although the show-up was unnecessarily suggestive, the identifications are highly reliable and will not be suppressed

Based on the totality of the circumstances, there is very little likelihood of misidentification by Caglar and Salmon. In *Neil v. Biggers,* 409 U.S. 188 (1972), the Supreme

Court held that the following factors should be considered in determining whether an identification is reliable:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id.* at 199.

An evaluation of the pertinent factors demonstrates that the witnesses made highly reliable identifications. Both witnesses had face-to-face contact with the Defendant. Caglar observed him for about a minute and a half in the parking lot, said that he slowly approached the vehicle, and that Defendant put his face two inches from the car's passenger window, so there is a good reason to believe that Caglar knew what Defendant looked like. Salmon and Defendant had "hard eye contact" and "stared into each other's faces" for about thirty seconds to one minute and he was close enough to Defendant to identify the firearm he carried. According to Salmon, the field identification occurred about fifteen to twenty minutes after the witnesses first encountered Defendant. Federal circuit courts have upheld witness identifications in sufficiently similar circumstances. *See Shavers*, 693 F.3d at 384-85 (although witnesses viewed robbery suspects for a short time and could only see parts of their faces that were concealed by hoodies, the identifications were reliable because the witnesses saw the suspects at close range, gave an accurate general description of the suspects' appearance, and identified them within minutes of the robbery); *United States v. Hawkins*, 499 F.3d 703, 710 (7th Cir. 2007) (robbery victim's identification reliable where it was reasonably accurate and the show-up occurred within one hour of the robbery); *Bruner v. Perini*, 875 F.2d 531, 535 (6th Cir. 1989) (robbery victim's identification was reliable where victim had face-to-face encounter with defendant, her

description of defendant was reasonably accurate, and the identification took place about 30 minutes after the robbery).

Defendant may be correct there are some differences among the witnesses' description and Defendant's actual appearance. For example, Salmon described Defendant as slender when he was large; Caglar believed he had ginger colored hair when his was darker; and apparently Defendant had a small dog with him that the witnesses did not report seeing. In addition, the incident occurred at nighttime in a lighted parking lot and Defendant wore a hood that somewhat impeded the view of his face. But these discrepancies do not detract from the fact that the witnesses' descriptions, given over numerous occasions, are largely consistent with one another and with Defendant's actual appearance. The eyewitnesses also expressed complete certainty in their identifications. Salmon said there was "no doubt" that Defendant was the assailant while Caglar agreed she was "absolutely clear" about the certainty of her identification. The witnesses' encounters with the Defendant were stressful, and any perceived inconsistencies or incomplete recollections are for the for the jury to consider when it weighs the identifications. *See Manson v. Brathwaite,* 432 U.S. 98, 116 (1977) ("[E]vidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.") Salmon and Caglar's out-of-court identifications were highly reliable and will not be excluded.

**2. In-Court Identifications**

Defendant moves to exclude "the expected in-court identification by" Caglar and Salmon of Defendant. Def.'s Mot. at 9. An in-court identification is technically one that is "made for the first time in court[ ]" before a jury, which has not yet occurred in this case. *United States v. Morgan*, 248 F. Supp. 3d 208, 211 (D.D.C. 2017). Because the Court has found that Caglar and

Salmon's identifications of Defendant are sufficiently reliable to be admitted at trial "[a]ny questions that remain about the reliability of the identifications" are for the jury to consider and Defendant remains "free to challenge [them] through the other Due Process safeguards of cross-examination, expert testimony, and jury instructions if warranted." *Robertson*, 2020 WL 85134, at *10.

**B. Fourth Amendment Analysis**

The Fourth Amendment provides in relevant part: "The right of the people to be secure … against unreasonable searches and seizures." U.S. Const. amend. IV. In general, law enforcement officers must obtain a warrant supported by probable cause before conducting a search or seizure. *Kentucky v. King*, 563 U.S. 452, 459 (2011). "Although 'the defendant bears the burden of proving whether and when the Fourth Amendment was implicated,' … '[t]he government then bears the burden of proving that its warrantless actions were justified [by an exception],'" *United States v. Neugin*, 958 F.3d 924, 930 (10th Cir. 2020) (quoting *United States v. Hernandez*, 847 F.3d 1257, 1263 (10th Cir. 2017)); *United States v. Shrum*, 908 F.3d 1219, 1229 (10th Cir. 2018) ("If the defendant meets his burden of establishing a warrantless seizure, the burden then shifts. The Government must establish the warrantless seizure was reasonable.") "The controlling standard of proof at a suppression hearing is proof by a preponderance of the evidence." *Shrum*, 908 F.3d at 1229 n.7 (citing *Nix v. Williams*, 467 U.S. 431, 444 n.5 (1984)). "If the government establishes that an exception to the warrant requirement applies, the search is constitutional." *Neugin*, 958 F.3d at 930 (citing *United States v. Maestas*, 2 F.3d 1485, 1491-92 (10th Cir. 1993)).

The Defendant makes two arguments for why the backpack search was unreasonable. First, although he recognizes that the police were permitted to conduct an initial investigative

detention (i.e. a "*Terry* stop") of him, he argues that the *Terry* stop did not extend to the search of his backpack. *See Hernandez*, 847 F.3d at 1268. Second, Defendant argues that the search was not a permissible search incident to an arrest. *See United States v. Knapp*, 917 F.3d 1161, 1165 (10th Cir. 2019).

The Government relies on neither exception to justify the search. Nor does it argue that probable cause existed to arrest Defendant or search his backpack. Its sole defense of the search is that exigent circumstances allowed officers to retrieve the gun because it posed a risk of danger to officers and the public. Because the Government carries the burden of proof to justify the warrantless search, *see Shrum*, 908 F.3d at 1219, the Court turns to its exigency argument.

**1. No exigent circumstances existed because the scene was secure and Defendant was detained**

One well-delineated exception to the warrant requirement is the existence of exigent circumstances. "Warrantless [searches or seizures] by criminal law enforcement officials may be legal when there is compelling need for official action and no time to secure a warrant." *Michigan v. Tyler,* 436 U.S. 499, 509 (1978); *Warden v. Hayden*, 387 U.S. 294, 298–99 (1967) ("The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others.") "In determining whether the risk of personal danger creates exigent circumstances, [the court uses] a two-part test: whether (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable." *United States v. Gordon*, 741 F.3d 64, 70 (10th Cir. 2014) (citation and quotation marks omitted). In conducting the analysis, the court looks "from the viewpoint of prudent, cautious, and trained officers." *Id.* "Reasonable belief does not require

absolute certainty; the standard is more lenient than the probable cause standard." *McInerney v. King*, 791 F.3d 1224, 1232 (10th Cir. 2015) (citation omitted).

The Government argues that one such recognized exigency is the right of police officers "to secure firearms that are unattended and pose a risk that the public will find the weapon." *United States v. Castillo*, 48 F. App'x 611, 613 (9th Cir. 2002). The Government cites no binding Tenth Circuit authority endorsing this view. But it quotes directly from the Ninth Circuit's unpublished opinion in *Castillo* that "[w]hile the mere presence of a firearm does not create an exigent circumstance … courts have found that the police have the right to secure firearms that are unattended and pose a risk that the public will find the weapon." *Id*. (citations omitted).

Viewing the evidentiary record from the standpoint of "prudent, cautious, and trained officers," the record shows the following facts weighing in favor of exigency. *Gordon*, 741 F.3d at 70. First, officers "had reason to believe that [the defendant] had recently had a gun, presumably loaded," and that Defendant was dangerous. *United States v. Ware*, 914 F.2d 997, 1001 (7th Cir. 1990). The two eyewitnesses reported that a man minutes earlier had brandished a loaded gun, was wearing dark jeans, a hoodie, and had facial hair. When Lerner reached the location where the witnesses said the incident occurred, there was an individual who generally matched the witnesses' description. Second, a pat-down of Defendant revealed no apparent weapons on his body. It therefore was reasonable to assume that a gun may have been in Defendant's backpack, and that opening the backpack to look for the weapon was necessary to neutralize any potential danger to third persons. Third, Officer Lerner went to the parking lot because he was responding to a 911 call, which "are the predominant means of communicating emergency situations." *United States v. Najar*, 451 F.3d 710, 719 (10th Cir. 2006) (citations and internal quotation marks omitted).

But, on the other hand, the record shows the following facts that weigh against exigency. First, Defendant was handcuffed and separated from the backpack by about twenty to twenty-five feet, making it "inconceivable" that he would grab the bag and reach for the gun within. *United States v. Leo*, 792 F.3d 742, 750 (7th Cir. 2015) (holding that investigatory *Terry*-stop did not permit officers to open the defendant's backpack which led to the discovery of a gun because defendant and co-defendant were handcuffed and separated from the backpack); *Knapp*, 917 F.3d at 1169 (holding that a search of a purse was not incidental to arrest because "not only were Ms. Knapp's hands cuffed behind her back, Officer Foutch was next to her, and two other officers were nearby. Moreover, the purse was closed and three to four feet behind her, and officers had maintained exclusive possession of it since placing her in handcuffs.") Second, although Officer Lerner testified that Defendant was initially non-compliant, by the time the search occurred Defendant was cuffed, the scene was secured by officers, and there were no problems. Third, although the Government claims that the gun posed a risk to the public and passerby, there is no evidence that anyone other than the officers knew about the gun. *Cf. United States v. Burchfiel*, 432 F. Supp. 3d 1230, 1237 (D. Kan. 2020) (upholding warrantless firearm seizure based on exigent circumstances where the firearm "was just above the door to the residence and visible to anyone on the sidewalk, and the defendant was not in custody.")

Thus, while the record contains some facts supporting a conclusion that the risk to the public's safety or third persons was present, those facts are not so overwhelming to dispense with the warrant requirement before conducting a search or seizure. Additionally, the Government's caselaw in support of its exigency argument is distinguishable because the officers in those cases observed guns in plain view. *See Ware*, 914 F.2d at 1000-01 (officer observed gun inside car in plain view through the automobile's window); *United States v. Webb*, 83 F.3d 913, 917 (7th Cir.

1996) (officer saw the defendant aim a gun at another individual before tossing the gun into a car's unlocked trunk). Here, in contrast, the gun was not in plain view. Officer Delgado only found the gun because he opened the backpack. The Government has not carried its burden of proof to show that exigent circumstances justified opening the backpack.

### 2. The evidence would have been inevitably discovered during an inventory search

Despite this conclusion, the gun will not be suppressed because it would have been inevitably discovered. *Nix v. Williams,* 467 U.S. 431 (1984), establishes that the inevitability of discovering certain evidence through lawful means removes the taint from that evidence even though it was originally discovered by unlawful means. "The inevitable discovery doctrine provides an exception to the exclusionary rule, and permits evidence to be admitted if an independent, lawful police investigation inevitably would have discovered it." *United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 2005). "Those lawful means include an inventory search." *United States v. Tueller*, 349 F.3d 1239, 1243 (10th Cir. 2003) (citing *United States v. Ibarra,* 955 F.2d 1405, 1410 (10th Cir. 1992)) (quotations omitted). Inventory searches are "a well-defined exception to the warrant requirement of the Fourth Amendment." *Colorado v. Bertine*, 479 U.S. 367, 371 (1987). The purposes of an inventory search are to protect the defendant's property while in police custody, to shield the police from claims of lost or stolen property, and to protect the police from potential dangers. *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976). "The government has the burden of proving by a preponderance of the evidence that the evidence in question would have been discovered in the absence of the Fourth Amendment violation." *United States v. Souza*, 223 F.3d 1197, 1203 (10th Cir. 2000).

Once Caglar and Salmon identified Defendant, probable cause was established for the offense of illegally carrying a firearm on university premises in violation of N.M. Stat. Ann. §

30-7-2.4(A), (C). *See Stansbury v. Wertman*, 721 F.3d 84, 90 (2d Cir. 2013) ("absent circumstances that raise doubts as to the victim's veracity, a victim's identification is typically sufficient to provide probable cause.") (citation and quotation mark omitted). Furthermore, "[w]hen a person is arrested in a place other than his home, the arresting officers may impound the personal effects that are with him at the time to ensure the safety of those effects or to remove nuisances from the area." *United States v. Perea*, 986 F.2d 633, 643 (2d Cir. 1993) (citations and quotation marks omitted). Once arrested, the contents of Defendant's backpack and any other items in his possession were necessarily going to be searched and inventoried under the university police department's inventory policy, which Officers Lerner and Delgado discussed. Therefore, the inventory exception to the warrant requirement applies, and the evidence found within Defendant's backpack will not be suppressed.

**IT IS THEREFORE ORDERED that** Defendant Steven O'Neil's Motion to Suppress Evidence Seized through Illegal Search **(ECF No. 19)** and Motion to Suppress Out-of-Court and In-Court Identifications **(ECF No. 20)** are **DENIED**.

**IT IS SO ORDERED**.

_____
Hon. Judith C. Herrera
Senior United States District Judge